ISAIAH GOOD BEAM, APPELLEE, V. JAMES C. BEAM ET AL., APPELLANTS.

FILED NOVEMBER 10, 1906. No. 14,463.

Evidence examined, and *held* to support the finding of the district court.

APPEAL from the district court for Nuckolls county: LESLIE G. HURD, JUDGE. *Affirmed.*

*Mockett & Mattley, R. D. Sutherland, George W. Groves* and *C. F. Strop,* for appellants.

*S. W. Christy,* contra.

DUFFIE, C.

December 26, 1902, Michael Beam, the father of the plaintiff and of the defendants James C. Beam and Phoebe

Glock, made a contract with the plaintiff, by the terms of which plaintiff was to pay to Mrs. Carrie Mathis $1,200 with interest, to Philip Glock $350, to Robert Tweed $60, and to Mrs. Glock $1,000. In addition he was to furnish the said Michael Beam with a comfortable home, board, nursing, care, washing, mending, medicines, physician's care, when needed, and $100 per annum; in consideration of which the said Michael Beam agreed that plaintiff should have the full control, use and income from the north half of section 24, township 4, range 5, in Nuckolls county, for and during the term of the natural life of said Michael, and at his death the premises were to become the absolute property in fee simple of the plaintiff. Thereafter Michael Beam lived upon the farm with his son until July 21, 1903, when he demanded a surrender of the contract, which being refused, he left the house, and from that date until April 8, 1904, made his home with his daughter Phoebe Glock, spending, however, some time in Kansas with his son James C., and also visiting the territory of Oklahoma. On August 11, 1903, the plaintiff wrote his father, who was then in Kansas, stating that he and his wife had made up their minds to leave the farm and that his father could have it to do with as he pleased; that he would leave March 1, 1904. He concluded the letter by saying: "This is the last writing I ever expect to do to you, and I don't want you to answer this or to come near me or in my house so long as I live, for I have not misused you, and Emma says the same, to stay away. P. S. I will give you the contract March 1, 1904. Burn that will at once and forever shut up about thing. Hoping you will find some fool that you can run over and knock down, then kick him for falling." Thereafter the plaintiff visited his father in Kansas, and tried to induce him to return to his home. One or more letters asking his father to return were written by the plaintiff, but all without effect. On April 8, 1904, the old gentleman returned to the farm where, after a few days, he was taken sick and died on the 19th of April,

34

1904. After his death the plaintiff brought this action against the defendants, his brother and sister, to enforce specific performance of the contract made with his father, alleging full performance upon his part. It is not controverted that, after the making of the contract, the plaintiff paid Michael Beam $100, Carrie Mathis her claim of $1,200, and interest, Robert Tweed $60, and interest, Philip Glock about $200, and he tendered into court $100 for Philip Glock, and $1,000 for Phoebe Glock; that he paid something over $100 on account of doctor's bills and funeral expenses of his father. The answer of the defendants alleges that plaintiff had failed to comply with the terms of the contract made with his father, and had violated and repudiated that contract; that the contract was obtained by undue influence, and also alleges the mental incapacity of Michael Beam to make the contract. The evidence is contained in a voluminous bill of exceptions, and we will confine our consideration of the testimony to what we regard as most material in determining the rights of the parties.

The land in controversy is worth from $16,000 to $18,000. Prior to the making of the contract Michael Beam had advanced to his oldest son, James C., money and property to the amount of about $7,000. The daughter had been thoroughly educated in the usual branches, as well also as in music. These matters the father had discussed with a number of the witnesses, and one of them testified: "He told me what he had done for Mrs. Glock and Jim; that Jim had all that was coming to him, and that Mrs Glock had chosen between an education and interest in the estate, and she had taken the education, and Good had done the work at home all the time and should have the farm." Prior to the making of this contract the old gentleman had caused a conditional deed of the farm to be made to his son Good, and called on a notary to acknowledge it. The notary read it over, and advised that before he execute it he consult with one of his old friends, a Mr. Tweed. Tweed advised against the making of the

deed, and told him to keep his property in his own hands, and the deed was destroyed. This deed, like the contract in suit, provided for the payment to the old gentleman of a certain annual sum, $1,000 to his daughter, the debts mentioned above, and a certain amount to his son James C. Afterwards the contract in question was drawn up by some party at the solicitation of the plaintiff, who left it on the forenoon of the day of its date in the hands of a notary, and on the afternoon of that day Michael Beam called and executed it. Before execution, the notary, at his request, read it to him twice, and that part of it providing for his own "keep," as he termed it, was read three times, after which it was duly signed and acknowledged. We infer from a careful reading of the evidence that sometime after its execution the old gentleman was led to believe, from conversations with third parties, that the contract operated as an absolute conveyance of the land, or, as it is termed by one of the witnesses, "a bond for a deed," and divested him of all interest in it. It was then, apparently, that he became dissatisfied and demanded a return of the contract. This being refused, he left the farm, as before stated, and remained away from July until the following April. We cannot avoid the impression that, if the old gentleman's suspicions had not been aroused as to the character of the contract, if he had not been led to believe that it took from him all interest in the land, this controversy never would have arisen. Nevertheless, when he demanded a rescission of the contract and a surrender of the agreement, and the plaintiff, in his letter of August 11, agreed to surrender it, this may have operated as a rescission, unless it is further made to appear that the old gentleman returned to the farm of his own volition and with a full understanding of what he was doing. On his return, one of his grandchildren asked him when he was going away, and he replied that he had come to stay, that it was his home, that he never would have left it except for the interference of other parties. To one of the neighbors, with whom he rode from church on the Sunday preceding

his return, he said that he was going back, that there was no place like home. The doctor who attended him in his last illness, and others who saw him during the time, testified to his full mental capacity up to within two or three days of his death. There is some evidence in the record tending to show mental incapacity on his part about the time the contract was made, and thereafter, but its character is such as not to impress us as entitled to any great weight, and, when compared with that of his physician and those who were most intimately acquainted with him, is completely overcome. One other circumstance, while not affecting the legal rights of the parties, should be mentioned. While in Kansas, and before returning to the farm, the old gentleman had a will prepared, by the terms of which he gave his daughter Phoebe $2,000, and his son James $1,000. A life estate in the farm was vested in his son Good, with remainder over to Good's children. He had also prepared a deed, in which his property was disposed of in the same way. These several instruments, and his frequent talks with his friends and neighbors, impress us with the belief that the old gentleman had always thought that his eldest son had received his share of the estate, and that an additional amount of $1,000 or $2,000 was the full share of the daughter in addition to what she had already received in the way of education and other advancements, and that, even while the misunderstanding between himself and his son Good existed, he intended to hold the farm for Good and his children. The evidence is quite conclusive as to the good care and consideration which the father received while living with the plaintiff, and were it not for the letter which the plaintiff himself wrote to his father, and another one found in the record written to his brother James, we would be disposed to say that the relations between the parties were as pleasant as usually exist between father and son living in the same house and conducting the same farm. While there was some excuse for writing the letters referred to, in the heat of the moment, and while the son was laboring under the impression that

the large sums of money paid on behalf of his father were lost, we find in those letters the only strong evidence against the enforcement of this contract, but, on the whole, are satisfied that the district court took the correct view of the case in entering a decree ordering a specific performance.

We recommend an affirmance of the decree.

ALBERT and JACKSON, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the decree of the district court is

AFFIRMED.